SELECTMEN of Windsor
*against*
STEPHEN JACOB, Esquire.

*No inhabitant of this State can hold a slave, and though a bill of sale transferring a person as a slave may be valid by the lex loci of another State or dominion, yet when the master becomes an inhabitant of this State, his bill of sale ceases to operate here, and cannot be read in evidence to charge him with the maintenance of such person in sickness or the imbecility of old age.*

THE plaintiffs, as selectmen and overseers of the poor of the town of *Windsor*, declared against the defendant in several counts of general *indebitatus assumpsit.*

First. For 100 dollars, money laid out and ex-pended.

Secondly. For work and labour done. Both stated to be on the 1st day of *January*, 1801.

The plaintiffs in their specification stated, That on the 26th of *July*, 1783, the defendant purchased of one *White, Dinah,* a negro slave, whom he then brought into the town of *Windsor;* that she continued to live with and serve him as a slave until some time in the year 1800, when she became infirm, sick, and blind, and in this condition was discarded by the defendant, and became a public charge, and that for the moneys expended by the corporation for medicine and attendance during her sickness, and for her support since, this action is brought.

General issue pleaded, and joinder.

In support of the declaration, the plaintiffs offered to read in evidence to the Jury the bill of sale from *White* to the defendant.

*Marsh,* counsel for defendant, objected. If this action can be supported, it must be on the principle of the implied contract a master is under to maintain his slave. But we contend that no person can be held in slavery in this State ; and the showing of a bill of sale can be no evidence that the unfortunate being supposed to be transferred by it as a human chattel, is a slave ; for the contract in the bill of sale is void by our constitution, which, in the first article of the declaration of the rights of the inhabitants of the State of *Vermont*, declares, " That all men are born equally free and independent, and have certain natural, inherent, and inalienable rights, among which

Selectmen
v.
Jacob.

Constitution.
*Vermont Stat.*
vol. 1. p. 30.

are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining happiness and safety: Therefore no male person born in this country, or brought from over sea, ought to be holden by law to serve any person as a servant, *slave*, or apprentice, after he arrives to the age of twenty-one years, nor *female* in like manner after she arrives to the age of eighteen years, unless they are bound by their own consent after they arrive to such age, or bound by law for the payment of debts, damages, fines, costs, or the like."

It will not be contended that the *African Dinah* is within the exceptions to this fundamental right.

*Hubbard*, for the plaintiffs, replied,

That though no person can hold a slave *de jure* by our constitution, yet there may exist among us a slave *de facto*. That if a master will hold an *African* in bondage as a slave, contrary to right, and for a succession of years, during which the slave *de facto* spends the vigour of her life in his service, and in which she may be presumed to have earned for the master sufficient to maintain her in the decrepitude of old age, there is a moral obligation upon the master to support her when incapable of labour; and the law of common justice, upon which all equitable actions are founded, will imply a promise in him to respond any necessary expenses incurred by others for her support.

That it would operate extremely hard upon corporations, who possessed no power to loose the shackles of slavery while the slave continued in health, to be

made a common infirmary for them when sick and useless.

That the position, " that slavery cannot exist in this State," must be taken *cum grano salis;* for in case a slave-holder should pass through our territory attended by his slave, the constitution of the *United States* protects the master's tenure in the slave, in case the slave should abscond. " No person held to service or labour in one State under the laws thereof, escaping into another, shall, in consequence of any law, or regulation therein, be discharged from such service or labour, but shall be delivered up on the claim of the party to whom such service or labour may be due;" and by the act of the *United States* " respecting fugitives from justice, and persons escaping from the service of their masters," passed during the second session of the second Congress, the magistrates of this State are holden to aid in the arrest of fugitive slaves; and if they find, on examination, that the fugitive is a slave under the laws of the place from which he fled, they must certify the slavery; and the master or his agent may remove the fugitive *as such,* from this State, and annexing a penalty against all who may impede the slave-holder in seizing his property or rescuing the slave after he has been arrested. The bill of sale in ordinary cases must be admitted by the magistrates to substantiate the slave-holder's right. The principle upon which such bill is founded cannot be drawn into question, for that had been already settled by the article of the *United States* constitution cited. If, therefore, the bill of sale cannot be exhibited in evidence in this case, because it is void by our State constitution, it cannot be shown in any case; and this would avoid

Selectmen
v.
Jacob.

Laws of the
*U. S.* vol. 1. 17.
art. 4. s. 2.

Ib. vol. 2. p.
166.

the constitution and laws of the *United States;* and, as if to meet the present case, the sixth article of the constitution of the *United States* declares, that this constitution, and the laws of the *United States* which shall be made in pursuance thereof, &c. shall be the supreme law of the land, and the Judges in every State shall be bound thereby, any thing in the *constitution* and laws of any State to the contrary notwithstanding.

*Marsh, contra.* A distinction is attempted to be made between a slave holden *de jure* and a slave *de facto;* and it is urged, that in the latter case there exists a moral obligation in the master of such slave, who has received the benefit of her services, to bear the burthen of her infirmities. There is indeed a moral obligation upon all to be charitable, and to conduct conformably to the principles of natural justice, but we consider that such principles do not operate for, but against the plaintiffs. We beg liberty to state the facts, which, at the same time they do away an illiberal charge made against our client in the specification, will show, that no implied promise in the defendant can be raised in equity to respond moneys expended by the plaintiffs in support of the slave *de facto.*

Some time in the year 1783, the defendant brought the woman *Dinah* into this State. She continued in his family several years; and there can be but little doubt, from the excellent character and disposition of her master, she would have so continued until this time in sickness and in health; but several of the inhabitants of *Windsor,* represented in their corporate

capacity by the present plaintiffs, discovering that she was an excellent servant, and wishing to profit themselves of her labours, inveigled her from her master's family and service by the syren songs of *liberty and equality*, which have too often turned wiser heads. She spent the vigour of her life with these people, and wasted her strength in their service; and now she is blind, paralytic, and incapable of labour, they aim by this suit to compel the defendant *solely* to maintain her; for as a member of the corporation, on the event of the failure of this suit, he must bear his proportion of the burthen.

When she was enticed from the defendant's service, he did not attempt by legal aid to reclaim her. As an inhabitant of the State, in obedience to the constitution, he considered that he could not hold her as a slave. Is it equitable then, that when the sovereign power had dissolved the tenure by which he held her services, and when he had been deprived of her labours by the enticement of others, that by the same power, and *virtually* at the suit of the same people who enticed her from his service, and who have profited by her labours when in vigour and health, he should now be compelled to maintain her in the decrepitancy of old age.

It is said, that it is extremely hard for a corporation, who possessed no power to remove the slave *de facto* from her master whilst in health, to be compelled to support her when sick or infirm.

The corporation of *Windsor* should have availed itself of the provision of the act in this as in all other like cases, by warning her to depart the town, which is the only mode pointed out in the statutes to avert

Selectmen
v.
Jacob.

from a town corporation the expense of maintaining a pauper.*

It is said, that by the operation of the constitution and laws of the *United States*, slavery may be said to exist in this State in a qualified sense. We are not disposed to investigate this position. It is certainly more curious than important in its application to the case in question. In this case the right of a claimant to a fugitive slave is not in issue. The simple point is, is the defendant obligated to refund moneys advanced by others for medicine and attendance, and in support of a woman who had formerly been in his service? We contend that it cannot be upon any other principle than that she is his slave; which cannot be admitted under our constitution of government.

TYLER, Assistant Judge.† The plaintiffs, as selectmen, and overseers of the poor of the town of *Windsor*, have declared in two general counts, and have displayed their cause of action in their specification, and rest it upon the implied liability the de-

---

* *Vide* An act in addition to an act, entitled, an act defining what shall be deemed and adjudged a legal settlement, and for the support of the poor, for designating the duties and powers of the overseers of the poor, and for the punishment of idle and disorderly persons, *Vermont* Stat. vol. 1. p. 400. c. xxxix. No. 2. passed *November* 6, 1801. The act to which this is an addition was passed *March* 3, 1797. Same volume, p. 382. A former act, " providing for and ordering transient, idle, impotent, and poor persons," was passed *March* 9, 1787. Vide *Haswell's* edit. *Vermont* Stat. p. 126. repealed 10th *November*, 1797. Vide *Vermont* Stat. vol. 2. p. 416. c. cxi. No. 2.

† JACOB, Assistant Judge, being a party, did not sit in this cause.

fendant is under to defray the expenses incurred by the sickness, and for the support of a blind aged person, who they allege is the defendant's slave, purchased by a regular bill of sale. In support of the declaration, this bill of sale is offered, and an exception is taken to its being read as evidence to the Jury. The question must turn upon the validity or operative force of this instrument *within this State.* If the bill of sale could by our constitution operate to bind the woman in slavery when brought by the defendant to inhabit within this State, then it ought to be admitted in evidence; and the law will raise a liability in the slave-holder to maintain her through all the vicissitudes of life; but if otherwise it is void.

Our State constitution is express, no inhabitant of the State can hold a slave; and though the bill of sale may be binding by the *lex loci* of another State or dominion, yet when the master becomes an inhabitant of this State, his bill of sale ceases to operate here.

With respect to what has been observed upon the constitution and laws of the Union, I will observe, that whoever views attentively the constitution of the *United States,* while he admires the wisdom which framed it, will perceive, that in order to unite the interests of a numerous people inhabiting a broad extent of territory, and possessing from education and habits, different modes of thinking upon important subjects, it was necessary to make numerous provisions in favour of local prejudices, and so to construct the constitution, and so to enact the laws made under it, that the rights or the supposed rights of all should be secured throughout the whole national domain. In compliance with the spirit of this constitu-

tion, upon our admission to the Federal Union, the statute laws of this State were revised, and a penal act,* which was supposed to militate against the third member of the 2d section of the 4th article of the constitution of the *United States,* was repealed; and if cases shall happen in which our local sentiments and feelings may be violated, yet I trust the good people of *Vermont* will on all such occasions submit with cheerfulness to the national constitution and laws, which, if we may in some particular wish more congenial to our modes of thinking, yet we must be sensible are productive of numerous and rich blessings to us as individuals, and to the State as an integral of the Union.

The question under consideration is not affected by the constitution or laws of the *United States.* It depends solely upon the construction of our own State constitution, as operative upon the inhabitants of the State; which, as it does not admit of the idea of slavery in any of its inhabitants, the contract which considers a person inhabiting the State territory as such, must be void. I am therefore against admitting the bill of sale in evidence.

Chief Judge. I concur fully in opinion with the Assistant Judge. I shall always respect the constitution and laws of the Union; and though it may sometimes be a reluctant, yet I shall always render a prompt obedience to them, fully sensible, that while

---

* The act to prevent the sale and transportation of negroes and mulattoes out of this State, passed *October* 30, 1786. *Haswell's* edition of the Statutes, p. 117.

I reverence a constitution and laws which favour the opinions and prejudices of the citizens of other sections of the Union, the same constitution and laws contain also provisions which favour our peculiar opinions and prejudices, and which may possibly be equally irreconcilable with the sentiments of the inhabitants of other States, as the very idea of slavery is to us. But when the question of slavery involves solely the interests of the inhabitants of this State, I shall cheerfully carry into effect the enlightened principles of our State constitution.

The bill of sale cannot be read in evidence to the Jury.

Plaintiffs nonsuited.

*Jonathan Hatch Hubbard* and *Amasa Paine,* for plaintiffs.

*Charles Marsh* and *Jacob Smith,* for defendant.